UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

RICKY S. HUNNICUTT,

Petitioner,

v.

Case No. 8:14-cv-3216-T-27AAS

SECRETARY, DEPARTMENT
OF CORRECTIONS,

Respondent.

_____________________________/

## ORDER

Ricky Shawn Hunnicutt, a Florida inmate, filed a counseled petition for writ of habeas corpus under 28 U.S.C. § 2254 challenging his Hillsborough County convictions for burglary of a dwelling with assault, aggravated assault, and three counts of sexual battery by use of threats of force. (Dkt. 1). Respondent contends the petition is time barred and otherwise opposes relief. (Dkt. 15). Hunnicutt filed a reply. (Dkt. 21). Upon consideration, the petition is DENIED.

## PROCEDURAL HISTORY

Hunnicutt was convicted after a 1991 jury trial of burglary of a dwelling with assault, aggravated assault, and three counts of sexual battery by use of threats of force. (Dkt. 17, Ex. 5). He was sentenced to four life terms and a consecutive10-year term. (Dkt. 17, Ex. 6, Ex. 7 at 32). His convictions were affirmed but the appellate court directed the minimum mandatory prison terms to run concurrently. (Dkt. 17, Ex. 11). His 1995 postconviction motion was denied. (Dkt. 17, Ex. 13, 17). The appellate court directed that his habitual offender sentences run concurrently. (Dkt. 17, Ex.

21). An amended sentence was entered October 18, 2000. (Dkt. 17, Ex. 22). He did not appeal.

Hunnicutt's postconviction proceedings span more than a decade. In 2013, the state appellate court affirmed, *per curiam*, the denial of postconviction relief. (Dkt. 17, Exs. 23, 25, 34, 38, 44). The Florida Supreme Court denied his petition for writ of habeas corpus. (Dkt. 17, Exs. 46, 49).

## TIMELINESS OF PETITION

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), "a state prisoner ordinarily has one year to file a federal petition for habeas corpus, starting from 'the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review.' 28 U.S.C. § 2244(d)(1)(A)." *McQuiggin v. Perkins*, 133 S. Ct. 1924, 1929 (2013). "If the petition alleges newly discovered evidence, however, the filing deadline is one year from 'the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.' § 2244(d)(1)(D)." (*Id.*). Additionally, "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection." 28 U.S.C. § 2244(d)(2). An application is "properly filed" when "its delivery and acceptance are in compliance with the applicable laws and rules governing filings." *Artuz v. Bennett*, 531 U.S. 4, 8 (2000).

Hunnicutt's October 18, 2000 amended judgment was final November 17, 2000, when the time for filing a direct appeal expired.[1] *See Armstrong v. State*, 148 So. 3d 127 (Fla. 2d DCA 2014). His limitation period commenced November 18, 2000, and ran for 226 days until July 2, 2001, when

[1] *See Ferreira v. Sec'y, Dep't of Corr.*, 494 F.3d 1286, 1293 (11th Cir. 2007) ("*Burton* [*v. Stewart*, 549 U.S. 147 (2007)] makes clear that the writ and AEDPA, including its limitations provisions, are specifically focused on the judgment which holds the petitioner in confinement.").

he filed a postconviction motion. (Dkt. 17, Ex. 23). That motion was pending when he filed his 2008 amended postconviction motion (Dkt. 17, Ex. 34). The motions continued to toll his limitation period until the mandate in the postconviction appeal issued on December 30, 2013. (Dkt. 17, Exs. 38, 45).[2] The balance of the limitation period expired without further tolling. Accordingly, his December 29, 2014 petition is untimely under § 2244(d)(1)(A).

**Newly discovered evidence**

Hunnicutt argues that his petition is timely under § 2244(d)(1)(D) based on newly discovered evidence that "came to light" in 2001 after he made a public records request to the Florida Department of Law Enforcement. (Dkt. 21 at 16). He alleges that "[a]s a result of his request and the discovery of this evidence," he filed his July 2001 postconviction motion and August 2001 notice seeking DNA testing under "newly enacted Rule 3.853 of the Florida Rules of Criminal Procedure." (*Id.*). He contends these motions "produced newly discovered exculpatory" evidence and therefore he had one year from the discovery of this evidence, subject to statutory tolling, to file his petition under § 2244(d)(1)(D). (Dkt. 21 at 18).

During the postconviction proceedings initiated by his 2001 postconviction motion, the state trial court required the State to conduct DNA testing on items collected at the victim's home where she had been assaulted in 1991. FDLE analyst Bencivenga conducted testing on two items and issued a June 22, 2005 report. (Dkt. 17, Ex. 55). Bencivenga determined that the DNA profile on the sample from the victim's bed comforter demonstrated the presence of a mixture, and that Hunnicutt

---

[2] Hunnicutt contends that his "conviction was final upon conclusion of the second direct appeal" (Dkt. 1 at 4), and his one-year limitation period under § 2244(d)(1)(A) began with the issuance of the December 30, 2013, mandate in the postconviction appeal. (Dkt. 21 at 17). However, as noted, he did not appeal his 2000 amended judgment, which was final on November 17, 2000. His limitations period therefore began on November 18, 2000.

was excluded as a contributor of the major DNA profile. The DNA profile for the minor contributor could not be conclusively determined. (*Id.*). The sample from the bed sheet did not contain any DNA foreign to the victim. (*Id.*).

<u>Ground One is Timely</u>

In Ground One, Hunnicutt contends that these DNA test results constitute newly discovered evidence, and raises a freestanding claim of actual innocence. (Dkt. 1 at 15). In Ground Five, he alleges that his state collateral appellate counsel rendered ineffective assistance. (Dkt. 1 at 37). These grounds are timely under § 2244(d)(1)(D).[3]

<u>Grounds Two, Three and Four are Untimely</u>

In Grounds Two and Three, he alleges violations of *Giglio v. United States*, 405 U.S. 150 (1972) and *Brady v. Maryland*, 373 U.S. 83 (1963). In support, he relies on documents he obtained as a result of his public records request and the June 25, 2001 correspondence from FDLE in response to that request. (Dkt. 2-1, Pet. Ex. G). However, he does not contend that FDLE objected to his public records request or explain why he could not have discovered that information earlier with the exercise of diligence. *See, e.g., Clifton v. Sec'y, Dep't of Corr.*, 2012 WL 3670264, at *4 (M.D. Fla. Aug. 27, 2012) (unpublished) (to the extent petitioner alleged that he was unaware of documents in prosecutor's file at the time of trial, he failed to demonstrate he acted diligently in waiting two years after his conviction was affirmed to request the file available under Florida's public records law once his conviction and sentence were final).

---

[3] When Bencivenga's 2005 report issued, Hunnicutt's 2001 postconviction motion was pending. Tolling the time his 2001 and 2008 postconviction motions were pending, that is, until the December 30, 2013, mandate issued in his postconviction appeal, ground one is timely. As to ground five, the factual predicate for the underlying claims he alleges collateral appellate counsel failed to raise was discoverable when his amended judgment was final. However, his claim that his appellate counsel was ineffective for failing to raise the issues was discoverable when counsel filed the initial brief. (Dkt. 17, Ex. 41). Tolling the time the appeal was pending, ground five is likewise timely.

In Ground Four, Hunnicutt alleges that his trial counsel rendered ineffective assistance by failing to: request further DNA testing, request and review all FDLE testing notes and data, review updated reports of analyst Marian Hildreth, object to analysts Karen Ostman and David Baer as experts on DNA evidence, examine chain of custody of evidence, object to the introduction of mislabeled and tampered hair evidence, consult with necessary experts, and present an alibi defense. (Dkt. 1 at 33-34).

The factual predicate for these claims is: (1) information that Hunnicutt allegedly provided to counsel before trial, (2) information in FDLE documents which existed at the time of trial, (3) testimony and evidence presented during trial, and (4) testimony from the 1998 state evidentiary hearing. All of this could have been discovered with the exercise of due diligence, at the latest, when his amended judgment was final in 2000.

Applying § 2244(d)(1)(D), Grounds Two, Three and Four are untimely because the factual predicate for these grounds was known or discoverable through the exercise of due diligence when his amended judgment was final. Accordingly, these grounds are time barred under § 2244(d)(1)(A) because Hunnicutt failed to raise them in a federal habeas petition within one year of the date his amended judgment was final, excluding the time his postconviction motions were pending in the state court.[4] And even if these grounds are timely, habeas relief is not warranted.

## STANDARD OF REVIEW

Under the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), habeas relief

[4] In his reply (Dkt. 21 at 19-20), he cites *McQuiggin v. Perkins*, 569 U.S. 383 (2013), which holds that actual innocence, if proved, serves as a gateway through which a petitioner may pass when the impediment is the expiration of the statute of limitations. To the extent that he asserts actual innocence to overcome the AEDPA's one-year limitation period, he fails to make the required showing, as discussed *infra*.

can only be granted if a petitioner is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).[5] The petitioner must demonstrate that the state court's adjudication of his federal claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d)(1)-(2).

## DISCUSSION

**Ground One**: "Mr. Hunnicutt is a wrongfully convicted Defendant who demonstrates actual innocence, and has an independent basis for review. The continued incarceration of Mr. Hunnicutt violates his rights to due process of law, constitutes cruel and unusual punishment and would be a manifest injustice."

(Dkt. 1 at 7). Ground One raises a freestanding claim of actual innocence, alleging that his continued incarceration violates due process and constitutes cruel and unusual punishment. *See Cress v. Palmer*, 484 F.3d 844, 854 (6th Cir. 2007) ("Cress contends that, given 'overwhelming' proof of his innocence, his continued incarceration violates his due process rights, an argument that has been characterized as a free-standing innocence claim when not coupled with allegations of constitutional error at trial.") (citing *Schlup v. Delo,* 513 U.S. 298, 314-17 (1995) (explaining the difference between a procedural innocence claim and a substantive innocence claim)). *See also Herrera v. Collins*, 506 U.S. 390, 417 (1993) (stating that it would "assume, for the sake of argument in deciding this case, that in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim").

---

[5]The AEDPA applies. *Wilcox v. Fla. Dep't of Corr.*, 158 F.3d 1209, 1210 (11th Cir. 1998).

The Supreme Court has "not resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence." *McQuiggin v. Perkins*, 133 S. Ct. 1924, 1931 (2013) (citing *Herrera*, 506 U.S. at 404-05). Eleventh Circuit precedent "forbids granting habeas relief based upon a claim of actual innocence, anyway, at least in non-capital cases." *Jordan v. Sec'y, Dep't of Corr.*, 485 F.3d 1351, 1356 (11th Cir. 2007). Even assuming that a freestanding claim of actual innocence is a cognizable claim, the standard for establishing a freestanding claim of actual innocence is "extraordinarily high," and the showing for a successful claim would have to be "truly persuasive." *Herrera*, 506 U.S. at 417.

Hunnicutt alleges that "this case has an inconsistent identification, an unsecured crime scene, inconsistent versions of timing, an alibi defense, exonerating DNA, falsely presented evidence in the form of DNA evidence and hair analysis testimony which was clearly false and misleading, intentionally withheld evidence, and ineffective assistance of counsel at both the trial and appellate court level." (Dkt. 1 at 16). Notwithstanding, he is unable to succeed on this claim, as he does not meet the *Schlup* standard, which requires him to demonstrate that, in light of new evidence, "it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt." *Id.*, at 327. Specifically, he has not presented new evidence that establishes his innocence.

**The claim of exonerating DNA evidence**

As background, Hunnicutt was convicted of burglary of G.R.'s home and committing aggravated assault and multiple acts of sexual battery on G.R. during the early morning of June 29, 1991. The attack occurred when G.R. was in bed with her two-year old child. G.R. observed Hunnicutt's face when he opened a bedroom curtain during the attack and recognized him as a former resident of the mobile home park. At trial, she identified him as her attacker.

FDLE analyst Karen Ostman tested items collected from G.R. and the scene for the presence of semen and conducted blood and enzyme typing and secretor status testing. At trial, she testified that, based on her finding that Hunnicutt was a non-secretor, he was included in the percentage of the population that could have produced semen on G.R.'s panty liner, bed sheet and comforter. (Dkt. 17, Ex. 4, T 469, 484-86). Hunnicutt contends that Ostman's testimony was in direct contradiction to DNA evidence presented by FDLE analyst David Baer at trial and DNA testing in 2005. (Dkt. 1 at 12). Baer's DNA test results are not, however, new evidence of innocence.

After Ostman conducted her secretor status testing, Baer conducted DNA testing on the panty liner and the sample from the bed sheet. He found that the male fraction on the panty liner matched the pattern for G.R.'s boyfriend and did not match Hunnicutt's. Baer obtained no result from the male fraction of the extract from the bed sheet and could make no determination. (Dkt. 17, Ex. 4, T 510-12, 516). Since Baer testified at trial about these findings, (*id.*), his DNA testing is not new evidence. *See, e.g., Bembo v. Sec'y Dep't of Corr.*, — Fed. App'x —, 2017 WL 5070197, at *3 (11th Cir. Mar. 30, 2017) ("[T]estimony was presented . . . that the medical center's lab did not detect any semen on the swabs that were collected from the victim. . . . [T]he jury was already aware of this information at the time it convicted Bembo, and it is not 'new evidence' that was not presented at trial for purposes of the actual-innocence exception.") (citing *McQuiggin,* 133 S. Ct. at 1935).

Further, the 2005 DNA test results that Hunnicutt relies on as exonerating evidence do not establish his actual innocence. *See Mendoza v. Sec'y, Fla. Dep't of Corr.*, 659 Fed. App'x 974, 982 (11th Cir. 2016) ("actual innocence generally requires the presentation of new evidence showing the petitioner's innocence"). He contends that "contrary to the testimony at trial, the bed sheet sample did not contain any DNA foreign to" G.R., the victim. (Dkt. 1 at 20). Analyst Bencivenga did state

in her June 22, 2005 report that no DNA profiles foreign to G.R., the victim, were found on the sample from the bed sheet. (Dkt. 1 at 20; Dkt. 17, Ex. 55). However, that no male DNA was found on the sheet sample in 2005 does not exonerate him. *See, e.g.*, *Case v. Hatch*, 731 F.3d 1015, 1043 (10th Cir. 2013) (where uncontested physical evidence presented at trial supported an attack of a sexual nature and no definitive DNA evidence was presented, later testing, showing the absence of male DNA or sperm cells on evidence, was neither incriminating nor exonerating and was not a "smoking gun" that exonerated petitioner from participation in the attack).

Likewise, the 2005 DNA testing on the bed comforter sample is not exonerating. Although the analyst stated in her report that Hunnicutt was excluded as the contributor of the major profile, she also stated that the DNA profile for the minor contributor could not be conclusively determined. (Dkt. 17, Ex. 55 at 2). To complete the analysis, she requested buccal cell swabs or a liquid blood sample from James Ward, the boyfriend of G.R. During trial, the State introduced testimony that G.R. and her boyfriend had consensual intercourse in the bed where the attack later occurred. (Dkt. 17, Ex. 4, T 163-64, 246-47). The 2005 DNA test results do not, however, exclude Ward as a contributor and therefore do not raise sufficient doubt about Hunnicutt's guilt to undermine confidence in the outcome of the trial. *Schlup*, 513 U.S. at 317.

Further, the DNA evidence developed in 2005 does not contradict G.R.'s trial testimony that she recognized Hunnicutt when he opened the window curtain during the attack, his face illuminated by street lighting. (Dkt. 17, Ex. 4, T 191, 232). Nor does the 2005 DNA evidence contradict the testimony that shortly after the attack, G.R. told her brother that she had been raped by "Ricky," Hunnicutt's first name, who once lived in the mobile home park. (Dkt. 17, Ex. 4, T 266). *See, e.g.*, *Brown v. Sec'y, Fla., Dep't of Corr.* 580 Fed. App'x 721, 727–28 (11th Cir. 2014) (new evidence that

Brown's DNA was not on mask at scene did not eliminate him as burglar or contradict the victims' positive identification of him, and other eyewitness accounts established that one victim called a burglar by Brown's first name and burglars referred to that victim by a nickname used by daughter of Brown's girlfriend).

The prosecution also presented testimony that on the morning of, and prior to, the attack on G.R., Hunnicutt was in the mobile home park where the G.R. lived. The State introduced the testimony of Donna Cole that on the evening before the attack, she encountered Hunnicutt outside the Carrollwood Cafe. He told her that he wanted to have sex with her. She ignored him and went in the bar. During the course of the evening, Hunnicutt made lewd gestures to other patrons, and after he asked Cole and her friend to go to the parking lot with him, the bar owner asked him to leave. After he left, Cole noticed that Hunnicutt was sitting in his car and she notified her husband. (Dkt. 17, Ex. 4, T 275-78, 291). When Mr. Cole drove to where Hunnicutt was parked, Hunnicutt drove off. Mr. Cole followed Hunnicutt, who eventually made a sharp turn into G.R.'s mobile home park. Mr. Cole estimated the time as about 3 a.m. Hunnicutt did not exit, and Cole left after about five minutes. G.R. testified that she heard someone running in the hallway of her home at 3:40 a.m. (Dkt. 17, Ex. 4, T180, 293-94). Obviously, the 2005 DNA evidence does not refute any of this trial testimony.

**The claims of an inconsistent identification, an unsecured crime scene, inconsistent versions of timing, and an alibi defense**

Hunnicutt argues that what "likely occurred" is that the Coles were mistaken as to the date they observed him, as he and the Coles were frequent patrons of the cafe. (Dkt. 21 at 3). He argues that he was with his wife most of the evening, "culminating in an argument between 12:30 a.m. and

12:45 a.m." (*Id.*). He also contends that law enforcement was called to his house at approximately 1:05 a.m, and he left the residence about 2 a.m. (*Id.*) But he does not cites new, reliable evidence that he was not at the bar when the Coles encountered him and that he did, as Mr. Cole described, leave the bar and turn into G.R.'s mobile home park at about 3:00 a.m. on the morning of the attack.

Next, Hunnicutt contends that when the attacker left G.R.'s home, she saw the attacker's exposed back but did not identify any tattoos on the attacker. He also cites trial testimony that police received information from his (then) wife that he had tattoos on his back, arms, and hand. (Dkt. 1 at 7, 8). And he contends that G.R. saw the attacker's face for only five seconds. Notwithstanding, G.R.'s testimony about her observations of the attacker and the testimony about Hunnicutt's tattoos was presented during trial and therefore does not constitute new evidence. *See Rozzelle v. Sec'y, Fla. Dep't of Corr.*, 672 F.3d 1000, 1017–18 (11th Cir. 2012) (evidence is not considered "new" when the jury heard the substance of virtually all such evidence).

Hunnicutt argues that G.R.'s brother testified that he received G.R.'s call at 2:30 a.m., about an hour before the attacker left, according to G.R. (Dkt. 1 at 8). He also alleges that G.R. told the nurse practitioner that she did not know who assaulted her and did not know his name. (*Id.*). And in his reply, he alleges that G.R. told her brother that "Ricky," who used to live in the mobile home park, raped her, and at trial, G.R. testified that she knew Hunnicutt as "Shawn." (Dkt. 21 at 2). But the jury was aware of all of this.

Next, he alleges that two prints obtained from a screen to a window on the floor of the living room where entry into G.R.'s home was gained, did not match his prints. (Dkt. 1 at 11). One print lacked sufficient detail, and the other print did not match Hunnicutt's prints. (Dkt. 17, Ex. 4, T 347-48). These findings were presented at trial, (*id.*), and therefore, the fingerprint evidence is not

new. *See Johnson v. Ala.*, 256 F.3d 1156, 1171 (11th Cir. 2001) (explaining that a claim of actual innocence must be supported by "reliable evidence not presented at trial"). He also contends the crime scene was not taped off. (Dkt. ) But the jury heard this testimony as well. In sum, none his contentions about G.R.'s identification, the crime scene, or G.R.'s statements presented during trial constitute new evidence.[6]

Finally, Hunnicutt contends that the identification evidence at trial was "significantly flawed" and that his contentions about G.R.'s identification and statements are "just a few" of the factors that establish a reasonable doubt about his innocence. (Dkt. 1 at 15). However, he presents no new evidence that establishes his actual innocence. Specifically, he has not shown that in light of the alleged new evidence he contends is exonerating, it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt. *Schlup*, 513 U.S. at 327.

**The 2008/2010 DNA evidence**

In support of his claim of innocence, Hunnicutt also addresses subsequent DNA testing on two cigarette butts that police recovered from G.R.'s home. (Dkt. 1 at 15-16). He contends that during his postconviction proceedings, the State elected to test the cigarettes, (Dkt. 21 at 13), and the only evidence that tested positive for his DNA was a "cigarette filter." (Dkt. 1 at 16). In 2008, Kristin Lehman, a forensic biologist with FDLE, conducted testing on an unknown cigarette butt and a Montclair brand cigarette butt collected by the police.[7] Lehman developed a profile for Hunnicutt at

[6] Hunnicutt argues that an unknown pubic hair from the sexual battery kit supports his claim of innocence. (Dkt. 21 at 12). At trial, analyst Hildreth identified an unknown hair in the pubic combing from the victim. (Dkt. 17, Ex. 3, T 535-36). Hunnicutt alleges that "[n]o testimony was provided at trial as to who the unknown pubic hair belonged to," (Dkt. 21 at 6), but he does not contend that he has new evidence about this hair that establishes his innocence.

[7] The technician found the cigarettes on the bedroom floor. (Dkt. 17, Ex. 4, T 312). At trial, G.R. testified that she did not smoke, her boyfriend did not smoke the Montclair brand, and they did not leave cigarettes in the home. (Dkt. 17, Ex. 4, T 204, 207-08, 223-24).

three loci and found that his profile matched the DNA profile from the unknown cigarette butt. Lehman requested buccal cell swabs from Hunnicutt for re-evaluation of his standard. (Dkt. 17, Ex. 29-1, T 129; Dkt. 22 at 45). In 2010, FDLE analyst Mary Pacheco obtained a full profile of Hunnicutt and found that his profile matched the DNA profile on the unknown brand cigarette butt. Lehman and Pacheco testified about their findings during the 2011 state evidentiary hearing. (Dkt. 17, Ex. 29-1, T 108-32; Ex. 29-2, T 41-45).

Hunnicutt alleges that the cigarette butt with his DNA was not a prominent feature at trial. He contends there is a "reasonable hypothesis" of innocence that the cigarette "filter" could only contain "touch DNA," since it was not tested for saliva. (Dkt. 1 at 16). He also alleges that this DNA evidence does not "provide proof of timing to know when DNA was placed on an object, if it was moved, or how long an object had been in its location." (*Id.*). While he gives his interpretation of the import of the DNA test results on the cigarette butt, he does not allege the existence of new evidence that another person was in possession of the cigarette butt before it was found at the scene.[8]

Hunnicutt also argues intentional tampering with evidence, undisclosed testing, false and misleading evidence, and ineffective counsel (Dkt. 21 at 24). But none of these claims raises new evidence establishing his actual innocence.

In sum, Hunnicutt fails to make "a truly persuasive demonstration of 'actual innocence.'" *Herrera*, 506 U.S. at 417. Accordingly, Ground One warrants no relief.

---

[8] In his reply, he alleges that the Montclair cigarette collected at the scene does not contain his DNA. (Dkt. 21 at 14). Analyst Lehman in her report stated that "a DNA profile was not obtained from the STR analysis of the cigarette butt – Montclair (Exhibit 20)." (Dkt. 22 at 45). This finding does not constitute new evidence of innocence or guilt.

**Ground Two**: "Mr. Hunnicutt was denied a fair trial due to the introduction of false and misleading evidence that resulted in a fundamental miscarriage of justice predicated on prosecutorial misconduct, and a violation of Mr. Hunnicutt's Due Process Rights under *Brady* and *Giglio*."

(Dkt. 1 at 17).

In Ground Two, Hunnicutt contends that the prosecution introduced false, improper and misleading evidence at trial, including serological testing, DNA testing, and microanalysis of hair evidence. More specifically, he alleges that the prosecutor presented false and misleading testimony of analyst Hildreth that she identified pubic hairs from various items that matched his hair, (Dkt. 1 at 22-23), and false testimony of analyst Ostman that he was included as a contributor to semen on items, in violation of *Giglio v. United States*, 405 U.S. 150 (1972). (Dkt. 1 at 26-27). These claims are unexhausted and procedurally defaulted because he did not raise the *Giglio* claims in his 2001 or 2008 postconviction motions. (Dkt. 17, Exs. 23, 34).[9] And he is unable to raise the *Giglio* claims in an untimely and successive postconviction motion. *See* Fla. R. Crim. P. 3.850(b), (h).

A federal court may address the merits of a procedurally defaulted claim if the petitioner demonstrates either cause for the default and actual prejudice resulting from the alleged constitutional

[9]The petitioner must exhaust available state court remedies for challenging his conviction, 28 U.S.C. § 2254(b)(1), thereby giving the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights. *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citation and quotation marks omitted). He must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).

While Hunnicutt argued in his initial brief on postconviction appeal that the prosecutor presented false testimony of Ostman in violation of *Giglio*, he did not raise this claim in his postconviction motions. He contends that he presented the *Giglio* claim as to Hildreth's testimony through his expert's testimony at the 2011 state evidentiary hearing. (Dkt. 21 at 12). However, he did not raise a *Giglio* claim as to Hildreth's testimony in his postconviction motions and in his initial brief on postconviction appeal.

And the Florida Supreme Court denied on procedural grounds his state habeas petition which alleged that the prosecutor violated *Giglio* by presenting false testimony of Hildreth and Ostman. (Dkt. 17, Ex. 46), The Court held that to the extent Hunnicutt sought a writ of habeas corpus, a petition for extraordinary relief cannot be used to litigate or relitigate issues that were or could have been raised on direct appeal or in prior postconviction proceedings. (Dkt. 17, Ex. 49). This rule is firmly established and regularly followed. *See* Fla. R. Crim. P. 3.850(m) (formerly Rule 3.850(l)). Federal habeas courts reviewing convictions from state courts will not consider claims that a state court refused to hear based on an adequate and independent state procedural ground. *Davila v. Davis*, 137 S. Ct. 2062 (2017).

violation, or that he is actually innocent. *Johnson v. Alabama*, 256 F.3d 1156, 1171 (11th Cir. 2001). Hunnicutt has not shown cause to excuse his default and actual prejudice, and he has not shown that new evidence establishes his actual innocence. Accordingly, he is not entitled to review of his procedurally defaulted *Giglio* claims.

Even if his *Giglio* claims are exhausted, the claims are without merit. To prevail on a *Giglio* claim, he must prove that: "(1) the prosecutor knowingly used perjured testimony or failed to correct what he subsequently learned was false testimony; and (2) such use was material [,] i.e., that there is any reasonable likelihood that the false testimony could have affected the judgment" of the jury. *Locascio v. Sec'y, Fla. Dep't of Corr.*, 685 Fed. App'x 837, 845 (11th Cir. 2017) (quoting *Ford v. Hall*, 546 F.3d 1326, 1332 (11th Cir. 2008) (internal quotation marks omitted)). The false testimony is material if it "could . . . in any reasonable likelihood have affected the judgment of the jury." *Giglio*, 405 U.S. at 154. Hunnicutt fails to show that the prosecutor knowingly introduced false testimony in violation of *Giglio*.

**The hair analysis testimony**

Hunnicutt alleges that the prosecutor presented false testimony from Hildreth that pubic hairs "matched" Hunnicutt. (Dkt. 1 at 20). Specifically, he contends that Hildreth testified at trial that she conducted a hair analysis based solely on a microscopic examination and was able to match him to "at least" nine hairs found at the scene. (Dkt.1 at 22). By comparison, he alleges that Hildreth testified in deposition that she could not declare a match to a particular person based solely on microscopic examination of the evidence. (*Id.*). Notwithstanding, he has not shown that Hildreth gave false testimony at trial.

Hildreth testified at trial that she tested two pubic hairs in the debris fold from G.R.'s panties.

She testified that one pubic hair exhibited the same microscopic characteristic as G.R.'s standard and the other pubic hair exhibited the same characteristics as Hunnicutt's pubic hair standard. (Dkt. 17, Ex. 4, T 539). When the prosecutor asked Hildreth, "So the Defendant's pubic hair standard matched the exhibit mounted on the slide[,]" Hildreth responded, "That's correct." (Dkt. 17, Ex. 4, T 539). However, Hildreth also responded that the "characteristics displayed in that questioned hair were also displayed in Mr. Hunnicutt's known pubic hair standard." (Dkt. 17, Ex. 4, T 539). And she testified that eight pubic hairs on G.R.'s bottom sheet displayed the same microscopic characteristics as Hunnicutt's standard. (Dkt. 17, Ex. 4, T 550-51).

Viewed in its entirety, and in the proper context, Hildreth's testimony was not false, as Hunnicutt contends. She testified that she could not state that hair came from a particular person. She explained that could only state that a questioned hair contains the same microscopic characteristics as an individual's standard. (Dkt. 17, Ex. 4, R T 552).

In view of Hildreth's explanation, Hunnicutt also fails to demonstrate that the discrepancy between Hildreth's testimony and her deposition testimony was material. He contends that the prosecutor "commented on pubic hairs matching him "no less than fifteen times" in closing argument. (Dkt. 1 at 22). Specifically, he contends that the prosecutor argued that "his pubic hairs were taken off the bed sheet and matched the standards that were provided to the lab" and argued, "we've got nine pubic hairs." (Dkt. 17, Ex. 4, T 649-50). However, the prosecutor also argued that the analyst could determine "whether or not the characteristics of a hair strand are similar in characteristics to another person." (Dkt. 17, Ex. 4, T 650). But even assuming the prosecutor drew an unwarranted inference from Hildreth's testimony, Hildreth made clear in her testimony that she could not determine that hair came from a particular person.

Finally, Hunnicutt argues that Hildreth's testimony is "troubling" because three hairs on several items "did not appear to match" him, G.R., or her boyfriend, "leaving the conclusion that the person who committed the crime has not been held accountable." (Dkt. 1 at 24). However, Hildreth testified that she could not make a determination that the three hairs were from the same person. (Dkt. 17, Ex. 4, T 558). Accordingly, this hair evidence does not demonstrate that another man was the attacker. And the prosecutor presented evidence other than Hildreth's testimony that established Hunnicutt was the attacker, including G.R.'s identification of him and the testimony that he entered the mobile home park before he attacked her. Considering the evidence, there was no reasonable likelihood that the challenged testimony of Hildreth affected the jury's verdict. *See Giglio,* 405 U.S. at 154.

**The claim of commingled and intentionally or negligently handled hair evidence**

Hunnicutt also contends that the State mislabeled and commingled hair evidence that he contends was a crucial feature in his case. (Dkt. 1 at 25). He alleges that in her deposition, Hildreth described several body and head hairs and one pubic hair collected from a pillow case, but testified at trial that the pillow case debris contained only one pubic hair. (Dkt. 1 at 25). He contends that his postconviction counsel and prosecutor Hale inspected the evidence on May 30, 2007 and agreed that hair evidence had been commingled, mislabeled or not labeled, and did not match the State's exhibit list. (*Id.*). He further contends that hair evidence was so poorly packaged, handled, mislabeled and commingled that it resulted in bath faith, leading "one to believe it was intentionally tampered with." (Dkt. 1 at 25). His contentions do not, however, raise a constitutional violation. Nor does he argue that potentially exculpatory evidence was destroyed in bad faith in violation of the constitutional right to due process. *See Arizona v. Youngblood*, 488 U.S. 51, 58 (1988). And his arguments, even if

construed to raise such a claim, are too speculative to make that showing. As the postconviction court held, he did not provide evidence that the commingling was intentional or in bad faith on the part of law enforcement. (Dkt. 17, Ex. 38 at 11).

**The DNA testing testimony**

Hunnicutt alleges that the prosecution presented false and misleading DNA testing evidence. (Dkt. 1 at 17). However, he does not demonstrate that the prosecutor knowingly presented false testimony of analyst Baer, who conducted the DNA testing on G.R.'s panty liner and bed sheet. While Hunnicutt cites the 2005 DNA testing conducted on the sample from the bed comforter (Dkt. 1 at 20), Baer did not test the comforter. And Hunnicutt's reliance on the 2005 finding that no profile foreign to G.R. was found on the bed sheet sample is misplaced. That test result does not show that Baer testimony that he obtained no result from the male fraction was false, considering that he did not find that result surprising given the sparse number of sperm reported by Ostman. (Dkt. 17, Ex. 4, T 504, 511, 516).

**The serology testimony**

Hunnicutt alleges that the prosecutor presented false testimony of analyst Ostman in violation of *Giglio*. (Dkt. 1 at 17). He contends that the prosecutor knew when she elicited testimony from Ostman that Hunnicutt was included as a possible contributor of semen on G.R.'s panty liner, that analyst Baer had excluded Hunnicutt as to the panty liner. (Dkt. 1 at 18; Dkt. 17, Ex. 53). But Hunnicutt fails to demonstrate that Ostman's testimony was false.

At the 2011 state evidentiary hearing, Ostman testified that while technology had improved, testing based on secretor status was an acceptable standard practice in 1991, and her trial testimony was not false. (Dkt. 17, Ex. 29-1 at 70, 102-03).

Hunnicutt contends that Ostman did not provide a statistical percentage to support her testimony that he was included as a possible contributor based on secretor status testing. Ostman testified during the 2011 hearing that her trial testimony was accurate, as the inference that Hunnicutt was included because he was a nonsecretor was based on 20 percent of the general population. (Dkt. 17, Ex. 29-1, T 90-91). Hunnicutt relies on Dr. Herrera's 2011 testimony that to include or exclude a person, statistics must be provided and that Ostman's testimony that Hunnicutt was included was improper. (Dkt. 1 at 21; Dkt. 17, Ex. 29-2 at 567-68). Hunnicutt also contends that during the 2011 hearing, analyst Pacheco testified that it would be wise to have a statistic of some type with a conclusion. (Dkt. 1 at 27). While this testimony may, in hindsight, pertain to the weight of Ostman's conclusions and credibility, none of it demonstrates that her testimony was false.

Hunnicutt alleges that Ostman knew she gave false testimony at trial, based on her note of a conversation with the prosecutor before trial. (Dkt. 1 at 18). Ostman made a log entry on September 16, 1991, stating "per conversation [with] C. Brumley [the trial prosecutor], no DNA will be done (due to exclusion of suspect)." Ostman also noted, "Hairs were returned to agency. She still wants micro done." (Dkt. 17, Ex. 29-1, T 68-69 and Ex. 51). This note provides no specifics as to the phrase, "exclusion of suspect," and, therefore, Hunnicutt fails to show that this note establishes that Ostman testified falsely at trial.

Hunnicutt also fails to show that Ostman's testimony that he was a possible contributor to semen on items because he was a nonsecretor, was material. The jury knew from Baer's DNA analysis that Hunnicutt's profile did not match the male profile on G.R.'s panty liner. Hunnicutt contends that at the very least, Ostman's testimony connected him to two pieces of "very damaging evidence, the bed sheet and comforter." (Dkt. 1 at 27). However, Ostman also included G.R.'s

boyfriend as a possible contributor to the semen on these items and the panty liner. (Dkt. 17, Ex. 4, T 485, 494-95). And when Ostman was asked during trial, "did you form any opinion or conclusions from which you could link with specificity and certain Mr. Hunnicutt to any of those specimens," she responded, "No, I did not." (Dkt. 17, Ex. 4, T 495).

**The *Brady* claim**

Hunnicutt claims that the prosecutor withheld evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). (Dkt. 1 at 17). He alleges, based on Ostman's note, that on September 16, 1991, the prosecutor told Ostman to discontinue DNA testing due to exclusion of the suspect, and to continue "micro hair analysis." (Dkt. 1 at 18). He alleges that this conversation occurred three months before trial and "no such testing results have been provided." (*Id.*). He also contends that his trial counsel was not aware that the prosecutor "had requested no more DNA testing due to the exclusion of the suspect," (Dkt.1 at 28).

Hunnicutt raised this *Brady* claim in his postconviction memorandum. (Dkt. 17, Ex. 36 at 19). The postconviction court concluded that Hunnicutt failed to present any evidence that the trial prosecutor's conversation with Ostman was an attempt to suppress exculpatory evidence. (Dkt. 17, Ex. 38, at 10). The state appellate court affirmed, *per curiam,* that ruling. The state postconviction court's denial of this claim was reasonable.

"As recognized in *Brady* and its progeny, principles of due process dictate that, in a criminal proceeding, the prosecution must disclose evidence favorable to the defendant." *Rimmer v. Sec'y, Fla. Dep't of Corr.*, 876 F.3d 1039, 1053 (11th Cir. 2017) (citing *Brady*, 373 U.S. at 87 and *Banks v. Dretke*, 540 U.S. 668, 691 (2004)). To establish a *Brady* violation, a defendant must prove three essential elements: (1) that the evidence was favorable to the defendant, either because it is

exculpatory or impeaching; (2) that the prosecution suppressed the evidence, either willfully or inadvertently; and (3) that the suppression of the evidence resulted in prejudice to the defendant. *Rimmer*, 876 F.3d at 1054 (citing *Turner v. United States*, 137 S. Ct. 1885, 1893 (2017), *Banks*, 540 U.S. at 691, *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)). Hunnicutt has not shown that the prosecution suppressed evidence favorable to him.

As noted, Ostman made a log entry on, stating "per conversation [with] C. Brumley [the trial prosecutor], no DNA will be done (due to exclusion of suspect)." She also noted, "Hairs were returned to agency. She still wants micro done." (Dkt. 17, Ex. 29-1, T 68-69 and Ex. 51). She testified during the January 2011 evidentiary hearing that she had no independent recollection of the September 16, 1991 conversation. (Dkt. 17, Ex. 29-1, T 68). While Hunnicutt ponders what testing the prosecutor had on that date, he did not confront the prosecutor with that question during the evidentiary hearing.

In his reply, he alleges that all disclosed DNA testing was dated after September 16, 1991, and that "there is no alternative than the glaring cold fact that the State Attorney, HCSO, or FDLE conducted additional testing that excluded" him. (Dkt. 21 at 7). Specifically, he alleges that DNA testing was conducted that was not disclosed to him. (Dkt. 21 at 8). However, during the state evidentiary hearing, he did not present evidence of testing he contends was not disclosed or specific test results. Accordingly, he fails to demonstrate that the prosecution withheld exculpatory test results. *See, e.g.*, *Jemison v. Nagle*, 158 Fed. App'x 251, 256 (11th Cir. 2005) (petitioner failed to show actual innocence based on allegation that the prosecutor withheld exculpatory DNA evidence where petitioner failed to produce the DNA report, and his proffered affidavits of others stating the report existed did not describe the contents of the report in any detail).

In denying relief on this *Brady* claim, the state postconviction court found: "From the evidence presented, it appears more likely that after considering that Mr. Baer's original tests only revealed a DNA profile that matched Mr. Ward, who recently had consensual intercourse on the same bed, and [G.R.'s] statements that her attacker did not ejaculate, the State did not believe further DNA testing would produce relevant evidence. Consequently, the conversation was simply [the prosecutor's] attempt to guide FDLE's limited resources toward more productive uses." (Dkt. 17, Ex. 38 at 10). This finding was a reasonable determination of the facts.

Ostman's note would not demonstrate that the prosecutor could have discussed Baer's analysis on September 16, 1991, since Baer conducted his DNA testing after the Orlando laboratory received items on November 1, 1991. (Dkt. 17, Ex. 4, T 501). And Ostman's note provides no details of any testing performed or any results, and Hunnicutt did not establish during the evidentiary hearing that the prosecutor withheld DNA test evidence that was favorable to him.

Hunnicutt contends that he was not aware that a November 1, 1991 FDLE submission form stated that vaginal swabs were removed from the sexual battery kit with specific instructions not to do DNA testing. (Dkt. 1 at 19, 28). He also alleges that the sexual battery kit contained an unsealed ziplock container. (Dkt. 21 at 6). He does not shown, however, that undisclosed testing was performed on the swabs, the container, or any other item.

In sum, Hunnicutt fails to demonstrate that the prosecution suppressed favorable evidence, either willfully or inadvertently. Since he fails to satisfy the suppression element, the prejudice element need not be addressed. The state court's decision rejecting this claim is not contrary to, nor an unreasonable application of *Brady*, and was not based on an unreasonable determination of the facts.

**Untested evidence**

Hunnicutt alleges that the state postconviction court ordered the State to perform DNA testing, but that ten items were not tested. (Dkt. 1 at 20). This argument does not present a cognizable claim for relief. *See Carroll v. Sec'y Dep't. Corr.*, 574 F.3d 1354, 1366 (11th Cir. 2009) (a challenge to a state collateral proceeding does not undermine the legality of the detention or imprisonment).

Ground Two therefore does not warrant relief.

**Ground Three**: "The Office of the State Attorney has continuously violated Mr. Hunnicutt's constitutional rights under *Brady* and *Giglio*, prior to, during, and after Mr. Hunnicutt's trial."

(Dkt. 1 at 29).

In Ground Three, Hunnicutt alleges that the prosecution knew on September 16, 1991 that he was "excluded on items of evidence used at trial." (Dkt. 1 at 29). He also alleges that evidence known to the prosecution and disclosed to Ostman on September 16, 1991 has not been provided to him or any of his attorneys and remains a "blatant" *Brady* violation. (Dkt. 1 at 30). However, his claims that the prosecution presented false testimony at trial and withheld favorable evidence have been addressed. And his claim that the State has "continuously violated" his constitutional rights under *Brady* and *Giglio* is procedurally defaulted became he did not raise this claim in his 2001 or 2008 postconviction motions. When he raised this claim in his state habeas petition (Dkt. 17, Ex. 46), the Florida Supreme Court denied relief on independent and adequate state procedural grounds when it held that habeas cannot be used to litigate issues that could be raised in an appropriate postconviction motion. (Dkt. 17, Ex. 49). He is unable to raise this claim in an untimely and successive postconviction motion, and he does not make the requisite showing to excuse his default.

Even if this ground is exhausted, relief is not warranted. *Brady* held that due process requires

a prosecutor to disclose material exculpatory evidence to a defendant before trial. *Id.*, 373 U.S. at 87. "The Supreme Court has also concluded that *Brady* does not apply in the post-conviction context, reasoning that '[a] criminal defendant proved guilty after a fair trial does not have the same liberty interests as a free man.'" *In re Bolin*, 811 F.3d 403, 408–09 (11th Cir. 2016) (quoting *Dist. Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 68–69 (2009). Accordingly, Hunnicutt cannot show that the prosecution has violated *Brady* by failing to disclose evidence subsequent to his conviction and sentence. And, as has been determined, he has not shown that the prosecution presented false evidence or withheld favorable evidence before or at trial in violation of *Brady* or *Giglio*.

Finally, Hunnicutt alleges that the State disregarded a state court order for DNA testing of a number of items, including vaginal swabs, (Dkt. 1 at 30), and contends that this Court has the authority to direct the State to complete the testing. (*Id.*). That essentially invokes a right to discovery under Rule 6(a) of the Rules Governing Section 2254 Cases. But he fails to show good cause. Rule 6(a) provides that "[a] judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Civil Procedure . . . ." Rules Governing § 2254 Cases Rule 6(a). Good cause is shown "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." *Bracy v. Gramley*, 520 U.S. 899, 909 (1997) (citation omitted).

Hunnicutt has not proffered sufficiently specific allegations demonstrating reason to believe that he may, if the facts are fully developed, be able to demonstrate that he is entitled to relief if DNA testing of the vaginal swabs or other items were ordered.

Ground three does not warrant relief.

**Ground Four:** "Mr. Hunnicutt was deprived of his Constitutional right to effective assistance of counsel because his trial attorney, Jack Gutman, Esquire, was deficient in his:

a. Failure to request further DNA testing;

b. Failure to request and review all FDLE testing notes and data;

c. Failure to review Marian Hildreth's updated reports;

d. Failure to object to Ms. Ostman and Mr. Baer testifying as experts in DNA evidence;

e. Failure to examine chain of custody;

f. Failure to object to the introduction of mislabeled and tampered hair evidence;

g. Failure to consult with necessary experts; and

h. Failure to present Mr. Hunnicutt's alibi defense."

(Dkt. 1 at 33-34).

Ineffective assistance claims are analyzed under the test in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* requires a showing of both deficient performance by counsel and resulting prejudice. *Id.* at 687. The standards *Strickland* and § 2254(d) are both highly deferential, and when applied in tandem, review is "doubly" so. *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (citations and internal quotation marks omitted).

**Claims a, h:** Counsel's alleged failure to request further DNA testing and present an alibi defense

Hunnicutt contends his trial counsel was ineffective in not requesting further DNA testing, (Dkt. 1 at 33). During the 1998 evidentiary hearing, he testified that he requested counsel to obtain DNA testing on all items of evidence. (Dkt. 1 at 36). His trial counsel testified during the hearing that he was concerned that testing would produce incriminating evidence. Counsel testified that

Hunnicutt told him that he had an ongoing sexual affair with G.R., had sexual intercourse with her in her bed on three or four occasions, and was at her home the night in question.[10] Accordingly, counsel planned to present a consent defense.

When Hunnicutt told the state trial court at a pretrial hearing that his was a case of mistaken identity, however, the defense was committed to an identification defense, and counsel wanted to proceed to trial as soon as possible to prevent the prosecution from conducting additional DNA testing. Counsel was concerned that additional DNA testing would produce evidence placing Hunnicutt at the scene. (Dkt. 17, Ex. 16, T 137-38). He and Hunnicutt discussed conducting testing on a cigarette butt and pubic hairs at the scene. He provided Hunnicutt an assessment that the better approach was to proceed to trial and argue that the State had not met its burden to establish guilt beyond a reasonable doubt. (Dkt. 17, Ex. 16, T 139). Hunnicutt alleges that the version that he "allegedly" provided counsel did "not involve any sexual act with [G.R.] that evening,"and counsel failed to present a "potential" evidence pointing to another suspect. (Dkt. 1 at 34).

In denying relief, the state trial court noted counsel's concern that additional DNA testing would inculpate Hunnicutt and held that Hunnicutt failed to meet *Strickland*'s performance prong, as he failed to show how counsel was not functioning as the counsel guaranteed him by the Sixth Amendment. (Dkt. 17, Ex. 17 at 7). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105.

In assessing a lawyer's performance, "[c]ourts must 'indulge [the] strong presumption' that

---

[10] Hunnicutt told counsel that he and G.R. "made out" and when she went into the bathroom at 3.a.m. and saw "passion marks" on her neck, she stated, "Jim is going to see this." (Dkt. 17, Ex. 16, T 134-36). He told counsel that when he threatened to expose the relationship to her boyfriend, G.R. stated, "if you do you will regret it." (*Id.*).

counsel's performance was reasonable and that counsel 'made all significant decisions in the exercise of reasonable professional judgment.'" *Chandler v. United States*, 218 F.3d 1305, 1314 (11th Cir. 2000) (en banc), *cert. denied*, 531 U.S. 1204 (2001). "The inquiry into whether a lawyer has provided effective assistance is an objective one: a petitioner must establish that no objectively competent lawyer would have taken the action that his lawyer did take." *Id. (citing Chandler*, 218 F.3d at 1315).

Moreover, counsel's trial strategy cannot be second guessed, as "judicial scrutiny of counsel's performance must be highly deferential." *Chandler*, 218 F.3d at 1314 (*quoting Strickland v. Washington*, 466 U.S. at 689). Tactical decisions within the range of reasonable professional competence are not subject to collateral attack, unless a decision was so "patently unreasonable that no competent attorney would have chosen it." *Adams v. Wainwright*, 709 F.2d 1443, 1445 (11th Cir. 1983). For example, tactical decisions such as calling some witnesses and not others ("the epitome of a strategic decision"), deciding whether to pursue residual doubt or another defense, and relying on line of defense to exclusion of others will not be second guessed, even if the prove to be unsuccessful. *Chandler*, 218 F.3d at 1315, n. 15. In sum, as counsel's trial strategy is presumptively reasonable, the determination is not "that the particular defense lawyer in reality focused on and, then, deliberately decided to do or not do a specific act." Rather, the presumption is "that what the particular defense lawyer did at trial . . . were acts that some reasonable lawyer might do." *Chandler*, 218 F.3d at 1314-15.

Considering counsel's assessment that a consent defense was weak, (Dkt. 17, Ex. 16, T 138), and his decision to proceed to trial as soon as possible to avoid addition DNA testing which he feared would place Hunnicutt at the scene if the mistaken identity defense was presented, there is a reasonable argument in the record that counsel's performance satisfied *Strickland*'s deferential

standard. Clearly, counsel's performance has not been shown to have been outside "the wide range of professionally competent assistance." *Van Poyck v. Fla. Dept. of Corrections*, 290 F.3d 1318, 1322 (11th Cir. 2002)(*quoting Strickland*, 466 U.S. at 690). And counsel's strategic decisions cannot be second guessed, as Hunnicutt attempts to do. Accordingly, the state court reasonably applied *Strickland* and made a reasonable determination of the facts.

Hunnicutt also contends that trial counsel failed to present an alibi defense. (Dkt. 1 at 34). Specifically, he alleged in his 1995 postconviction motion that his trial counsel was ineffective for failing to call his former wife to provide an alibi. Hunnicutt argues that his former wife testified at the 1998 hearing that he came home between 3:30 and 4:30 a.m. (Dkt. 1 at 35).[11] Hunnicutt also argues that his former wife's nephew, Robert Browning, testified during the 1998 hearing that Browning lived with him on June 29, 1991 and Hunnicutt came home about 3:30 a.m. (*Id.*).

During the 1998 hearing, trial counsel testified that Hunnicutt did not discuss with him the possibility of calling his former wife to provide an alibi. And counsel testified that he and Hunnicutt were aware that Deputy Perez, who spoke with Hunnicutt's wife, would have testified that Hunnicutt's wife did not know his whereabouts before 5:05 a.m. on the day in question.[12] (Dkt. 17, Ex. 16, T 121-122). Counsel also testified that Hunnicutt did not inform him about Robert Browning, as the postconviction court found in denying relief. (Dkt. at 6). Counsel testified that Hunnicutt told him that his wife could testify that he did not smoke the brand of cigarettes found at the scene and tha

[11] Mrs. Phillips, his former wife, testified at the 1998 hearing that she could have told police that he came home about 4:30 or 5:00 a.m. (Dkt. 17, Ex. 16, T 19). In denying relief, the postconviction court found that the wife's memory was not clear as what she told police when first interviewed. The state court noted that Deputy Perez testified during his deposition that Hunnicutt's wife told him that Hunnicutt left their home about 2 a.m. and returned at 5:15 a.m. (Dkt. 17, Ex. 17 at 5).

[12] Counsel testified that the officer's report stated that Hunnicutt's wife advised that she did not see him until 5:05 a.m. (Dkt. 17, Ex. 16, T 123). At trial, the victim testified the attacker left about 4:45 a.m. (Dkt. 17, Ex. 4, T 197).

he used a lighter instead of matches.[13] (Dkt. 17, Ex. 16, T 126). However, counsel thought that the jury would find her testimony self-serving, and did not want to forego the advantage of the opening and rebuttal closing arguments available under state procedures at the time. (Dkt. 17, Ex. 16, T 125). This was likewise a sound tactical decision within "the wide range of professionally competent assistance" which will not be second guessed.

In denying this claim, the state court noted that counsel testified that Hunnicutt never discussed the possibility of calling his wife to provide an alibi. (*Id.*). Considering counsel's testimony that Hunnicutt did not mention Browning or tell him that his wife could provide an alibi, the record establishes there is a reasonable argument that counsel's performance satisfied *Strickland.* And in addressing counsel's testimony as to the wife's information about the cigarettes and matches, the state court found that counsel made a tactical decision that did not amount to ineffective assistance and denied relief on *Strickland*'s performance prong. (Dkt. 17, Ex. 17 at 6).

The state court's denial of this claim was not contrary to or an unreasonable application of clearly established federal law under *Strickland.* Nor was it based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

**Claims b through g**: Counsel's alleged failure to: request and review all FDLE testing notes and data; review Hildreth's updated reports; object to Ostman and Baer's testifying as DNA experts; examine chain of custody; object to introduction of mislabeled and tampered hair evidence; and consult with necessary experts

These claims are procedurally defaulted because Hunnicutt did not raise them in his 1995

[13] At trial, the victim testified that the attacker lit a match during the attack and left the match book that was recovered. (Dkt. 17, Ex. 16, T 204, 223-24, 318).

postconviction motion. (Dkt. 17, Ex. 13 at 23-24). And when he raised several of these claims[14] in his state habeas petition, the Florida Supreme Court denied the petition on independent and adequate state procedural grounds. (Dkt. 17, Exs. 46, 49). He is unable to raise these claims in an untimely and successive postconviction motion. And he fails to show cause to excuse his default and actual prejudice. Nor does he present new evidence establishing his actual innocence.

**Ground Five**: " Mr. Hunnicutt was denied effective assistance of appellate counsel due to counsel's failure to litigate the Brady and Giglio violations regarding the exculpatory evidence and the hair evidence and failure to properly argue an actual innocence claim."

(Dkt. 1 at 37).

In Ground Five, Hunnicutt contends his collateral appellate counsel was ineffective. This ground does not raise a cognizable claim for habeas relief. "The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254." 28 U.S.C. § 2254(I); *see also Martinez v. Ryan*, 566 U.S. 1, 17 (2012) ("Section 2254(I) precludes [a habeas petitioner] from relying on the ineffectiveness of his postconviction attorney as a 'ground for relief.'").[15]

Ground five does not warrant relief.

Accordingly, it is **ORDERED** that:

1. The petition for writ of habeas corpus (Dkt. 1) is **DENIED**.

---

[14] He alleged in his state petition that trial counsel failed to: request DNA testing, request and review FDLE testing notes and data, examine chain of custody of hair and debris, consult with necessary experts, and present any defense, alibi witnesses, and other potential evidence, and object to false testimony. (Dkt. 17, Ex. 46 at 41-43).

[15] Hunnicutt alleges that his appellate counsel was ineffective for not properly litigating issues that presented to the trial court, "particularly the blatant false and misleading testimony concerning DNA and hair evidence." (Dkt. 21 at 23). He cannot show cause for his default of the underlying *Giglio* claims under *Martinez v. Ryan*, 566 U.S. 1 (2012). The equitable rule established in *Martinez* applies only to excusing a procedural default of ineffective-trial-counsel claims. *See Chavez v. Sec'y, Fla. Dep't of Corr.*, 742 F.3d 940, 945 (11th Cir. 2014).

2. The Clerk is directed to enter judgment against Petitioner and to close this case.

**Certificate of Appealability**

Petitioner is not entitled to a certificate of appealability. 28 U.S.C. § 2253(c)(l). He is entitled to a COA only if he demonstrates that reasonable jurists would find debatable whether the § 2254 petition stated "a valid claim of the denial of a constitutional right." *Id.*; *Slack v. McDaniel,* 529 U.S. 473, 484 (2000). To make a substantial showing of the denial of a constitutional right, he "'must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong,'" *Tennard* v. *Dretke,* 542 U.S. 274, 282 (2004) (quoting *Slack,* 529 U.S. at 484), or that "the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El* v. *Cockrell,* 537 U.S. 322, 335-36 (2003) *(quoting Barefoot v. Estelle,* 463 U.S. 880, 893 n.4 (1983)).

Petitioner cannot make the required showing and therefore is not entitled to a COA or to appeal *in forma pauperis.*

**ORDERED** on this 6th day of March, 2018.

**JAMES D. WHITTEMORE**
**United States District Judge**

Counsel of Record